IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| WILEY & WILSON, INC. d/b/a WILEY\|WILSON, | * | |
| | * | |
| Plaintiff/Counter-Defendant, | * | Civ. No. MJM-22-2418 |
| | * | |
| v. | * | |
| | * | |
| PONTIAC DRYWALL SYSTEMS, INC. d/b/a PDSI CONTRACTORS, | * | |
| | * | |
| Defendant/Counter-Plaintiff. | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Wiley & Wilson, Inc., d/b/a Wiley|Wilson ("WW"), initiated this civil action against defendant Pontiac Drywall Systems Inc., d/b/a PDSI Contractors ("PDSI"), alleging breach of contract and, alternatively, quantum meruit. ECF No. 1 (Compl.). PDSI subsequently filed a counterclaim against WW, also alleging breach of contract. ECF No. 4 (Countercl.). This matter is presently before the Court on WW's Motion for Summary Judgment, ECF No. 68.[1] Plaintiff's motion is fully briefed, and no hearing is necessary to resolve it. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth below, the Court shall deny WW's summary judgment motion.

---

[1] There are two other pending motions in this matter—a Motion to for Leave to Withdraw as Counsel of Record filed by the attorneys and the law firm who represent PDSI, ECF No. 72, and the firm's Motion for Leave to File Defense Counsel's Reply Under Seal and Ex Parte, ECF No. 76. The Court will address these motions in a separate opinion and order.

## I.   BACKGROUND

In July 2017, the entity responsible for the design, construction, and maintenance of Navy facilities, the Naval Facilities Engineering Systems Command ("NAVFAC"), issued a Request for Proposal ("RFP") seeking a contractor to renovate a building at the U.S. Naval Academy (the "Project"). Countercl. ¶ 4; ECF No. 68-2 (Pl. Ex. A) at 2. The RFP called for the completion of the Project in 739 days, Countercl. ¶ 6, and the construction completion date ("CCD") was initially set at January 31, 2020, ECF No. 68-5 (Def. Resps. to Interrog. Nos. 1–11) at 7. PDSI, a Michigan-based firm providing general contractor, construction management, and program management services, submitted a proposal in response to the RFP. Compl. ¶ 2; Countercl. ¶ 6. On January 22, 2018, NAVFAC accepted PDSI's proposal and issued PDSI a Notice of Award. Countercl. ¶ 6; ECF No. 68-5 (Pl. Resps. to Interrog.) at 7.

PDSI lacks its own design capabilities and therefore sought to partner with another company to develop a renovation design. Countercl. ¶ 7; ECF No. 6 (Ans. to Countercl.), ¶ 7. PDSI intended to partner with Borealis Enterprises, LLC ("Borealis"), a subsidiary of NTVI Federal, Inc. ("NTVI"). That company was to take over the design and other pre-construction services and assist PDSI in the construction management of the Project. Countercl. ¶ 7; Ans. to Countercl. ¶ 7. For several months, Borealis/NTVI and PDSI worked together under a Letter of Intent while negotiating a formal contract. Countercl. ¶ 7; Ans. to Countercl. ¶ 7. During this time, Borealis/NTVI engaged subcontractors for the Project, including WW, a Virginia-based architecture and engineering firm that was brought in to work on the renovation design. Compl. ¶ 1; Countercl. ¶ 7; ECF No. 69-3 (Dep. of Christopher Garner, Vice President of WW) at 51:5–10; ECF No. 69-4 (Def. Ex. C).

Negotiations between PDSI and Borealis/NTVI collapsed, however, and PDSI subsequently contacted WW to ask if it would be willing to continue as the designer for the Project under a direct contract with PDSI. Countercl. ¶¶ 7–8; Garner Dep. at 53:10–54:9; Pl. Resps. to Interrog. at 7. Part of PDSI's interest in continuing to work with WW was because of the firm's extensive experience with NAVFAC projects. ECF No. 69-2 (Dep. of Leonard Travis, PDSI President and corporate designee) at 78:5–11; Garner Dep. at 35:8–36:7. WW drafted and provided its own contract to PDSI for review and execution. Countercl. ¶ 8; Ans. to Countercl. ¶ 8. By that point, WW had provided approximately seven months of design services for the Project without a written contract in place. ECF No. 68-4 (Def. Resps. to Reqs. for Admis.) at 4.

The parties entered a contract (the "Contract") during the late summer of 2018, though the exact date on which the Contract was signed is disputed,[2] and the Contract itself is undated. *See* ECF No. 68-2 (Contract); Garner Dep. at 54:18–55:7. The Contract designated PDSI as the Design-Builder and WW as the Architect of Record on the Project. Contract at 1. As the Design-Builder, PDSI contracted directly with NAVFAC and was ultimately responsible for the design and construction of the Project. Def. Resps. to RFA at 3; ECF No. 69-5 (Dep. of Charles Auvenshine, PDSI Project Manager/Executive) at 38:2–4. Though PDSI delegated the design and pre-construction work to WW, PDSI was still responsible for monitoring the design development process and interfacing with NAVFAC on any impacts to Project scheduling and construction sequencing. Def. Resps. to RFA at 8. As the Architect, WW was to perform its services (1) "consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances" and (2) "as expeditiously as

---

[2] WW asserts that the Contract was executed on September 4, 2018, whereas PDSI asserts that it was executed on August 31, 2018. *See* Compl. ¶ 10; Counterclaim ¶ 9.

[wa]s consistent with such professional skill and care and the orderly progress of the Project." Contract at 6.

The Contract listed WW's compensation as $1.125 million and stated that PDSI could "not withhold amounts from the Architect's compensation to impose a penalty or liquidated damages on the Architect, or to offset sums requested by or paid to contractors for the cost of changes in the [w]ork unless the Architect agree[d] or ha[d] been found liable for the amounts in a binding dispute resolution." *Id.* at 22, 25. Under the Contract, fees were to be invoiced monthly based on the percentage complete for each phase of the Project and were due within 45 days from the date of invoice. *Id.* at 31; *see also* ECF No. 68-3 (Travis Dep.) at 49:15–19. The Contract also permitted either party to terminate the agreement "upon not less than seven days' written notice should the [non-terminating] party fail substantially to perform in accordance with the terms of [the Contract] through no fault of the party initiating the termination." Contract at 21.

Appended to the Contract was a design schedule dated August 21, 2018 (the "Schedule"), prepared by WW. *Id.* at 27–28. The Schedule indicated that WW was to submit its design to NAVFAC by February 15, 2019, such that NAVFAC could have accepted the design by March 8, 2019. *Id.* at 28; Countercl. ¶ 12. PDSI considered the schedule to be "part of th[e] [C]ontract." Travis Dep. at 52:15–16. The Contract itself specifically states that the Schedule is part of the agreement. Contract at 25. Further, the Contract provides that, "Once approved by the Design-Builder, the Architect and Design-Builder shall not exceed time limits established by this schedule without reasonable cause." Contract at 6.

By the time the Contract was executed, WW had finished over 35% of the renovation design; the value of the services completed was already "in excess of $400,000." Garner Dep. at 55:10–56:2, 60:4–15, 61:3–13; Travis Dep. at 58:5–9. Despite this, WW was unable to meet the

deadlines set in the Schedule. For instance, WW was supposed to submit a complete design document to NAVFAC by December 13, 2018, but the firm did not resubmit its 35% complete design drawings—which reflected feedback that NAVFAC provided on November 7, 2018—until February 2019. Garner Dep. at 92:11–93:17. WW also represented to PDSI on January 16, 2020, that 100% of the Issued for Construction ("IFC") design documents were completed, *id.* at 218:7–20, yet an invoice dated February 26, 2020, reflected that 0% of the IFC submittal work was done, *id.* 223:2–226:17; *see also* ECF No. 1-2 at 2. WW submitted its final design to NAVFAC over fourteen months late, causing a reduction in PDSI's planned revenue and its ability to absorb overhead costs. *See* ECF Nos. 69-6 (Def. Ex. E) & 69-12 (Def. Ex. J).

WW rejects PDSI's contention that the delay was caused by its own errors and failures. It asserts that the delay was instead caused by NAVFAC's "unusual and baseless rejections" of its design submissions, "as well as PDSI's own failings in communicating with the government and Project participants . . . and ensuring that the Project proceeded according to the . . . Schedule[.]" Ans. to Countercl. ¶ 17. Nonetheless, WW's Vice President acknowledged that PDSI did not contribute to the firm's delay in submitting the 100% pre-final design to NAVFAC. Garner Dep. at 152:11–14. He also admitted that the Project was no different from the firm's other NAVFAC projects in any way that would have caused a slower response time, and that WW did not "have any difficulty communicating with PDSI" "[d]uring the design phase of the [P]roject." *Id.* at 252:14–253:1.

On February 21, 2020, NAVFAC contacted PDSI to ask whether WW had been "paid in full or if there [were] any outstanding payments due to them by PDSI." ECF No. 68-10 (Pl. Ex. I) at 2. PDSI admitted that there were "still outstanding payments due to WW" and that WW's "last billing was rejected" because it "bill[ed] out work that was not approved." *Id.* at 1. In response,

NAVFAC indicated that PDSI needed to make "timely payments" to subcontractors "from the proceeds of the payment[s]" it received from NAVFAC to be compliant with federal regulations, and asked PDSI for "proof of payment [to WW]" regarding three specific invoices. *Id.* WW continued to provide services to PDSI despite not being paid. ECF No. 68-3 at 57:19–58:20. PDSI later received a Contractor Performance Assessment Report ("CPAR") prepared by NAVFAC for the period from January 22, 2018, through April 1, 2020, though the parties dispute whether the CPAR indicated any major failings by WW in the design process. Countercl. ¶ 20; Ans. to Countercl. ¶ 20.

On May 29, 2020, NAVFAC approved the IFC design documents prepared by WW, and PDSI began constructing the design shortly thereafter. Compl. ¶ 14; ECF No. 4 (Ans. to Compl.) ¶ 14 . WW then began providing PDSI construction administration services on the Project. Compl. ¶ 15; Ans. to Compl. ¶ 15. It submitted twenty invoices to PDSI for services performed from January 2020 to December 16, 2021, totaling $741,124, ECF No. 1-2, but PDSI again refused to accept WW's billings. Def. Resps. to RFA at 5; Travis Dep. at 50:11–14, 57:15–18.

PDSI later submitted requests for payment to NAVFAC certifying the completion of the services performed by WW, and NAVFAC issued payment to PDSI for those services, but WW still did not receive payment from PDSI. Def. Resps. to RFA at 5; Compl. ¶ 18; Ans. to Compl. ¶ 18. WW had not agreed to a withholding of payment, nor had it been found liable for any amounts in a binding dispute resolution proceeding. Def. Resps. to RFA at 4. On September 27, 2024, PDSI was terminated by NAVFAC before completing the Project. *Id.* at 5; Travis Dep. at 70:22–71:11.

On September 22, 2022, WW initiated this suit against PDSI, alleging breach of contract or, in the alternative, quantum meruit, for PDSI's failure to pay after WW completed its services. Compl. at 4–5. On November 18, 2022, PDSI answered the Complaint and filed a counterclaim

against WW, alleging breach of contract for WW's failure to timely perform its services. *See generally* Countercl. About three weeks later, WW answered PDSI's counterclaim. *See* Ans. to Countercl.

On November 22, 2023, PDSI disclosed that it designated two expert witnesses in this matter, Gregory Lee and Curt Merritt, though only the former prepared a report. *See* ECF No. 68-6 (Def. Fed. R. Civ. P. 26(a)(2) Disclosures). According to Lee's report, PDSI incurred $2,431,243.69 in extended overhead costs while remaining on standby during WW's design delays and suffered a 77.72% reduction in planned revenue during this period. *See* Def. Ex. E at 50–53.

On May 2, 2025, WW filed a Motion for Summary Judgment, ECF No. 68, seeking summary judgment on liability and damages with respect to its Complaint and summary judgment on PDSI's Counterclaim. ECF No. 68. WW argues that there is no genuine dispute of material fact that PDSI breached the Contract by withholding payment and failed to designate a registered architect to opine on the standard of care and breach thereof applicable to WW's professional services. ECF No. 68-1 (Pl. Mem. in Supp. Mot. for Summ. J.) at 10–18. PDSI responded in opposition, ECF No. 69, and WW subsequently replied, ECF No. 70.

## II.    STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248

(1986) (emphasis removed). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249, 255.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citing *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)). The burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)).

## III.    DISCUSSION

WW seeks summary judgment against PDSI on both counts of its Complaint and on PDSI's Counterclaim. Each party asserts a claim for breach of contract against the other, and WW asserts, in the alternative, a claim for quantum meruit. Under Maryland law, "[t]he elements of a claim for breach of contract include 'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 17 A.3d 744, 749 (Md. Ct. Spec. App. 2011)). "In Maryland, a claim for quantum meruit, or unjust enrichment, has three elements." *Quickley v. Univ. of Maryland Med. Sys. Corp.*, Civ. No. CCB-12-321, 2012 WL 4069757, at *6 (D. Md. Sept. 14, 2012) (citing *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 352 (2007)). "The plaintiff must show: (1) a benefit conferred upon the

defendant by the plaintiff; (2) the defendant appreciated or knew about the benefit; and (3) the defendant accepted the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Id.* (citing *Hill*, 936 A.2d at 352). WW claims, in sum, that PDSI breached its contractual obligation to pay WW for work it performed on the Contract and, alternatively, that PDSI was unjustly enriched by withholding payment. As to PDSI's Counterclaim, WW argues that it is entitled to summary judgment because, without an expert to offer an opinion on standard of care, PDSI cannot prove that WW fell short of its contractual obligations.

The Court does not find that WW is entitled to judgment as a matter of law on its claims against PDSI because there is evidence in the record that, in withholding payment, PDSI sought to recoup its losses based on WW's delays. And, further, summary judgment on PDSI's Counterclaim is unsupported because PDSI does not require an expert to establish WW's breach based on its delays in performance.

### A. WW's Complaint

WW argues that PDSI's withholding of payment breached the Contract, specifically § 11.11.3. Pl. Mem. at 10–11. That provision prohibits the Design-Builder on the Project from "withhold[ing] amounts from the Architect's compensation to impose a penalty or liquidated damages on the Architect, or to offset sums requested by or paid to contractors for the cost of changes in the Work unless the Architect agrees or has been found liable for the amounts in a binding dispute resolution proceeding." Contract at 25. PDSI admits that WW has not agreed to nor been found liable for any amounts in a binding dispute resolution proceeding. Def. Resps. to RFAs at 4. But PDSI argues that its withholding of payment did not violate § 11.11.3 because the withholding was not a penalty or imposition of liquidated damages, WW's delays caused it to

suffer damages, and PDSI withheld payment to recoup those damages as was its right under Maryland common law. Def. Opp'n at 10–12.

"A recoupment is a diminution or a complete counterbalancing of the adversary's claim [for money damages] based upon circumstances arising out of the same transaction on which the adversary's claim is based[.]" *Smith v. Westminster Mgmt., LLC*, 290 A.3d 1161, 1198 (Md. App. Ct. 2023), *aff'd*, 312 A.3d 741 (Md. 2024) (internal quotation marks omitted) (quoting *Pines Plaza Ltd. P'ship v. Berkley Trace, LLC*, 66 A.3d 720, 733 n.22 (Md. 2013)). "Recoupment . . . must arise out of the same transaction that is the subject matter of the plaintiff's action and . . . can only be used to reduce or avoid the plaintiff's recovery." *Id.* (quoting *Imbesi v. Carpenter Realty Corp.*, 744 A.2d 549, 557 (Md. 2000)); *see also First Nat. Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 (4th Cir. 1982) (citation omitted) ("Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim."). As an equitable remedy, "the party seeking recoupment bears the burden of establishing its entitlement to [recoup]." *Smith*, 290 A.3d at 1200.

A defendant has the right to recoup when "the plaintiff has not complied with some cross-obligation of the contract on which [it] sues or because the plaintiff has violated some legal duty in the making or performance of that contract." 20 Am. Jur. 2d *Counterclaim, Recoupment, and Setoff* § 5. "In an action for breach of contract in which the defendant alleges that the plaintiff also has breached the contract, the defendant is entitled to claim recoupment for any damages 'which were the certain result' of the plaintiff's breach." *Holland v. Psychological Assessment Res., Inc.*, Civ. No. CCB-04-437, 2004 WL 1368873, at *5 (D. Md. June 16, 2004) (quoting *Smith v. Smith*, 558 A.2d 798, 805 (Md. Ct. Spec. App. 1989)).

It is uncontested that PDSI's recoupment claim is offered to avoid WW's recovery and arises from the same transaction underlying WW's breach of contract claim, as the claim is based on damages PDSI incurred due to WW's failure to timely perform under the Contract. Still, WW argues that PDSI's right of recoupment is expressly precluded by terms of the Contract, which prohibit PDSI from withholding amounts from WW's compensation "to impose a penalty or liquidated damages" on WW. Contract at 25. WW further argues that, in any event, PDSI cannot a right to recoupment because it received and retained payment from NAVFAC for WW's services and therefore suffered no damages as a result of WW's alleged breach, and it lacks clean hands to invoke the equitable remedy of recoupment. ECF No. 70 at 1–4. The Court rejects each of these arguments.

First, the Court cannot find as a matter of law that PDSI withheld payment as a "penalty" for WW's alleged breach of contract and therefore violated the terms of the Contract. "Penalty" is defined as a "[p]unishment imposed on a wrongdoer" and, in civil actions, is "usu[ally] in the form of . . . [a] fine." *Penalty*, BLACK'S LAW DICTIONARY (12th ed. 2024). It is also defined as "[a]n extra charge against a party who violates a contractual provision." *Id.* The record does not support the conclusion that PDSI's withholding of payment was a "fine" or an "extra charge" imposed upon WW. The record includes evidence that PDSI withheld payment from WW to cover over $2.4 million in extended home office overhead costs incurred during the 439-day delay on the Project attributed to WW, Def. Ex. E at 52, and, thus, PDSI still had to account for more than "$1,500,000 in additional general conditions expenses" after recouping over $700,000 from WW, Countercl. ¶ 31. The Court finds sufficient evidence to create a genuine dispute that PDSI's withholding of WW's payment was done to "counterbalanc[e]" the costs it incurred during the lengthy delays on the Project, not to punish WW. *Smith*, 290 A.3d at 1198.

Second, WW's argument that PDSI could not have suffered any damages as a result of WW's alleged breach because it received funds from NAVFAC is unconvincing. As noted above, the record includes evidence that PDSI's damages from WW's delays exceeded the amounts it received from NAVFAC. *Compare* Def. Ex. E at 52 (concluding that PDSI incurred approximately $2.5 million in extended home office expenses), *with* Compl. ¶ 16 (citing ECF No. 1-2) (alleging approximately $741,124 in damages for unpaid invoices).

Finally, WW's "unclean hands" argument fails. To be sure, "the remedy of recoupment cannot be invoked by a party who lacks clean hands." *Smith*, 290 A.3d at 1200 (citation and internal quotation marks omitted). "For a party to have 'unclean hands,' its conduct 'need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim.'" *Id.* (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)). Here, WW's argument that PDSI lacked clean hands is circular. WW contends that PDSI cannot invoke recoupment because PDSI breached the Contract. But PDSI's alleged breach—withholding WW's payment—was itself the very act PDSI contends was an exercise of recoupment based on costs PDSI incurred as a result of WW's alleged breach. The Court declines to treat PDSI's withholding as both the basis for, and the bar to, its recoupment defense.

In view of the foregoing, the Court denies summary judgment as to both counts in WW's Complaint. The Court cannot find as a matter of law that PDSI breached the Contract or was unjustly enriched in withholding of payment to WW.

### B. PDSI's Counterclaim

WW also seeks summary judgment in its favor on PDSI's counterclaim. PDSI asserts a single count for breach of contract. Countercl. ¶¶ 47–56. It alleges that "WW breached the Contract by failing to perform its services 'consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances' . . . [and] 'as expeditiously as is consistent with such professional skill and care and the orderly progress of the Project.'" *Id.* ¶¶ 51, 54; *see also* Contract at 6. PDSI also alleges that "WW agreed that it would not exceed the time limits established by the Schedule without reasonable cause[,]" and that it did exceed those time limits by "14 month[s]." *Id.* ¶¶ 30, 50, 54; *see also* Contract at 27–28.

WW contends that, because PDSI's Counterclaim alleges breach of the Contract's standard-of-care provisions, PDSI must present expert testimony from a qualified design professional to establish that professional standard of care and the contractual breach by WW alleged in its Counterclaim. Pl. Mem. at 17; Pl. Reply at 6–7.[3] However, PDSI's Counterclaim is not limited to that theory; it alleges multiple bases for finding a breach by WW. The counterclaim also alleges a breach based on WW's alleged failure to adhere to the contractual timeline for completing its services set forth in the Schedule. *See* Countercl. ¶ 50 ("WW agreed that it would not exceed the time limits established by the Schedule without reasonable cause."); Contract at 25 (prohibiting parties from "exceeding time limits established by this schedule without reasonable cause").

---

[3] Both parties acknowledge that the expert witness who PDSI retained and generated a report, Gregory Lee, is not a trained design professional. Lee was retained to offer an opinion about PDSI's damages resulting from WW's delays.

The Court agrees with PDSI that this matter is analogous to *Racine Cnty. v. Oracular Milwaukee, Inc.* There, Racine County, Wisconsin brought a breach of contract action against several vendors (collectively, "Oracular") that had contracted with the County to provide computer software services. 781 N.W.2d 88, 91 (Wis. 2010). In response to the County's RFP, which "provided that the project was to be completed in three stages," Oracular submitted a proposal wherein it stated it would "complete th[e] project on time and on budget." *Id.* at 91–92. Appended to the proposal was a "seven-phase plan . . . broken down in a Gantt chart." *Id.* Oracular submitted another addendum on January 12, 2004. On February 2, 2004, the parties entered a contract that incorporated by reference the RFP, Oracular's proposal (including the attached Gantt chart), and the January 12, 2004, addendum, and set a project completion date of September 7, 2004. *Id.* at 92–93. "In this case, . . . Racine County alleged that Oracular breached the Agreement by not completing the project by the [agreed upon] date . . . ." *Id.* at 96. Because a "fact-finder is capable of determining for itself whether [a] project was . . . completed by [a particular date]," the Wisconsin Supreme Court held that the County's breach of contract claim "d[id] not present issues so unusually complex as to require expert testimony as a matter of law." *Id.* at 90, 98.

Similarly, in this case, PDSI alleges breach of contract based on untimely performance, and evidence in the record before the Court supports this theory. For example, the Schedule reflects that WW's 100% pre-final design document was supposed to be submitted to NAVFAC on December 13, 2018. *See* Contract at 28. However, WW submitted this document to NAVFAC in February 2019. Garner Dep. at 92:11–93:17. On May 17, 2019, WW only submitted a 95% pre-final design document to NAVFAC—six months after the 100% pre-final design document was due. Def. Ex. E at 33. Nearly two weeks later, this submission was rejected by NAVFAC. *Id.* WW resubmitted the document on June 21, 2019, but received another rejection. *Id.* WW resubmitted

it again on November 27, 2019, and this version was accepted by NAVFAC over six months after WW's initial submission of the 95% pre-final design document. Ultimately, the end date of the Schedule, March 8, 2019, was eclipsed by over four-hundred days. *See* Contract at 28; Def. Ex. E at 52. The Court agrees with PDSI that no expert testimony is required for a factfinder to understand that taking "more than twice the agreed upon duration to complete [performance under the Contract]" constitutes a breach. Def. Opp'n at 13–20. Accordingly, the Court cannot find that WW is entitled to judgment as a matter of law on PDSI's Counterclaim. Its motion for summary judgment is denied.

## IV.    ORDER

For the foregoing reasons, it is by the United States District Court for the District of Maryland hereby ORDERED that Plaintiffs' Motion for Summary Judgment (ECF No. 68) is DENIED.


   3/31/26                                          /S/
Date                                          Matthew J. Maddox
                                              United States District Judge

15